436 So.2d 383 (1983)
The FLORIDA CHAPTER OF the SIERRA CLUB, a Non-Profit Corporation, Appellant,
v.
ORLANDO UTILITIES COMMISSION, Appellee.
No. 83-77.
District Court of Appeal of Florida, Fifth District.
August 18, 1983.
*384 Irby G. Pugh, Orlando, for appellant.
Thomas B. Tart, Staff Counsel, Orlando Utilities Commission, Orlando, and Ken Van Assenderp of Young, Van Assenderp, Varnodoe & Benton, P.A., Tallahassee, for appellee.
J. Alan Cox, Asst. Gen. Counsel, Dept. of Environmental Regulation, Tallahassee, for appellee Dept. of Environmental Regulation.
William H. Green, Gary P. Sams and Elizabeth C. Bowman of Hopping, Boyd, Green & Sams, Tallahassee, for amicus curiae, Florida Electric Power Coordinating Group, Inc.
COBB, Judge.
The Florida Chapter of the Sierra Club (Sierra) appeals from a certification order for the proposed Curtis H. Stanton Energy Center, Unit 1, a 415-megawatt coal-fired power plant to be built by the Orlando Utilities Commission in Orange County. We affirm.
The order, issued by the Governor and Cabinet under the Florida Electrical Power Plant Siting Act (FEPPSA), sections 403.501 to 403.517, Florida Statutes (1981), is the final step in the process for certification of power plants in Florida. Before turning to the facts of the instant appeal, a brief outline of the statutory process of certification is in order.
The FEPPSA was adopted initially in 1973, with the legislative intent clearly spelled out in section 403.502, Florida Statutes (1981), which states in pertinent part:
The Legislature finds that the efficiency of the permit application and review process at both the state and local level would be improved with the implementation of a process whereby a permit application *385 would be centrally coordinated and all permit decisions could be reviewed on the basis of standards and recommendations of the deciding agencies. It is the policy of this state that, while recognizing the pressing need for increased power generation facilities, the State shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interest of the public. Such action will be based on these premises:
(1) To assure the citizens of Florida that operation safeguards are technically sufficient for their welfare and protection.
(2) To effect a reasonable balance between the need for the facility and the environmental impact resulting from construction and operation of the facility, including air and water quality, fish and wildlife, and the water resources and other natural resources of the state.
(3) To provide abundant, low-cost electrical energy.
The process of certification involves four agencies of the state government: The Department of Environmental Regulation, The Department of Veteran and Community Affairs, the applicable water management district, and the Public Service Commission (PSC). The initial application for certification is filed with the DER § 403.504(3), which then furnishes the application to the other three agencies, with each having a specific responsibility in the application process.
The Department of Veteran and Community Affairs reports to the DER on the compatibility of the proposed electrical power plant with the state comprehensive plan. The water management district, in whose jurisdiction the proposed electrical plan is located, prepares a report on matters within its field of expertise, and the Public Service Commission prepares a report on the present and future need for the electrical generating capacity to be supplied by the power plant. § 403.507. The affirmative determination of need by the PSC is a condition precedent to the conduct of a certification hearing. § 403.508(3). These reports are collected by the DER, which then recommends either to grant or to deny the power plant application in a report submitted to the certification hearing officer. § 403.504(8).
While the DER is collecting the reports from the other agencies, a land use hearing is conducted in the county of the proposed site of the plant. The sole issue for determination at this hearing is whether or not the proposed site is consistent and in compliance with existing land use plans and zoning ordinances. The order of the hearing officer from this hearing is then reviewed by the Siting Board, which consists of the Governor and Cabinet, for final approval. § 403.508(2).
The final stage of the certification process is a certification hearing held by a hearing officer from the Division of Administrative Hearings. § 403.508(3). Following the hearing and the officer's recommendation and findings of fact and law, the Board reviews that order. If the order is approved and certification granted, the construction and operation of the power plant may begin. § 403.511. The issuance or denial of the certification by the Board constitutes final administrative action required as to the application. § 403.509(3). The proceedings under Chapter 403 are reviewable as provided in Chapter 120. § 403.513.
In the instant case, no issue is raised regarding the reports filed by the Department of Veteran Affairs or the St. Johns Water Management District, both of which agreed that the power plant was acceptable in their respective areas. Additionally, the zoning and land use hearing, which the Sierra Club attended in August, 1981, but at which it produced no witnesses or evidence, *386 led to a determination that the power plant was in compliance with existing land use plans and zoning ordinances of Orange County. This recommendation was approved by the Siting Board on October 21, 1981.
The focus of this appeal is the report issued by the PSC on October 9, 1981, finding that a need exists for the proposed power plant. In the report, the PSC found that the plant will provide significant economic benefits to Florida in terms of supplying alternatives to oil-fuel generation, displacing approximately 3,750,000 barrels of foreign oil per year. The Commission found that the plant will lead to lower costs to the utility customers by 1987, and lead to fuel diversity free from foreign embargoes. The PSC reached this determination after two days of public hearings on August 13 and 14, 1981. Sierra did not participate at any point in the PSC hearings, but sent a letter to the PSC, urging it to consider alternative conservation measures.
Following the submission of the reports, the DER issued an analysis recommending certification of the plant, subject to some 34 conditions, which were agreed to by the Orlando Utilities Commission.
The certification hearing in the instant case was held on March 15-22, 1982, with the Sierra Club, as well as other parties, participating in the hearing. Following the taking of much testimony, as well as the receiving of the DER's report, the hearing officer issued his findings of fact, conclusions of law and recommended order on November 12, 1982. In the order, the hearing officer described the background of the area, the plans for the plant, its effect on air, water and wildlife, and the testimony presented at trial regarding these matters. The officer concluded that:
Unit 1 and its associated facilities, if constructed as applied for with the subject conditions of certification, will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life. The operation safeguards as proposed for Unit 1 are technically sufficient for the protection and welfare of the citizens of Florida. Further, a reasonable balance is struck between the need for the facility and the environmental impact resulting from construction and operation of the facility. Finally, the facility is capable of providing abundant low-cost electrical energy.
The hearing officer recommended that the certification be granted for the 415-megawatt plant, with ultimate site capacity of approximately 2,000 megawatts.
On December 7, 1982, a public hearing was held by the Governor and Cabinet, sitting as the Siting Board. Sierra was represented by counsel at the hearing and presented testimony. The Board issued its order on December 14, 1982, unanimously approving the certification of the plant and adopting the order of the hearing officer. On January 13, 1982, Sierra filed its Notice of Administrative Appeal from this final order.[1]
Sierra Club contends the certification of the plant was in error, due to the misconstruing of section 403.519, Florida Statutes (1981), by the hearing officer and the Board. That section provides as follows:
403.519. Exclusive forum for determination of need.  On request by a utility or on its own motion, the commission shall begin a proceeding to determine the need for an electrical power plant subject to the Florida Electrical Power Plant Siting Act. The commission shall be the sole forum for the determination of this matter, which accordingly shall not be raised in any other forum or in the review of proceedings in such other forum. In making its determination, the commission shall take into account the need for electric system reliability and integrity, the *387 need for adequate electricity at a reasonable cost, and whether the proposed plant is the most cost-effective alternative available. The commission shall also expressly consider the conservation measures taken by or reasonably available to the applicant or its members which might mitigate the need for the proposed plant and other matters within its jurisdiction which it deems relevant. The commission's determination of need for an electrical power plant shall create a presumption of public need and necessity and shall serve as the commission's report required by s. 403.507(1)(b). (Emphasis added.)
The Sierra Club contends that the hearing officer is required to balance the degree of need versus the environmental impact of the project, something it claims was not done here, since the hearing officer and the Board saw the determination of need as a matter strictly for the PSC (the Commission), whose determination would not be tampered with.
Section 403.519 was not part of the initial FEPPSA, but was added in 1980, as part of the Florida Energy Efficiency and Conservation Act, sections 366.80 to 366.85, Florida Statutes (1981). In that act, the legislature specifically states that it finds that the PSC is the appropriate agency to adopt goals and approve plans related to the conservation of electrical energy and natural gas usage. § 366.81. Additionally, in 1981, the legislature amended section 403.508, dealing with the certification hearing, to include the provision that "however, an affirmative determination of need by the Public Service Commission pursuant to section 403.519 shall be a condition precedent to the conduct of the certification hearing." These statutes show an intention on the part of the legislature that the PSC was to be the sole determiner of need and that need was not a proper topic for examination at the subsequent certification hearing.
In the instant case, the hearing officer found that need for the plant was not an issue in the proceeding, since that need was previously determined by an order of the PSC. The purpose of the certification hearing is spelled out in the stipulation between the parties, as follows:
Nature and purpose of the hearing. The purpose of the certification hearing is to put on the record for the hearing officer testimony and other evidence of a competent and substantial nature concerning whether location, construction and operation of the proposed Stanton Energy Center and related facilities will produce minimal adverse affects on human health, the ecology of the land and wildlife, the ecology of state waters and their aquatic life.
The precise purpose of the hearing is to hear testimony and produce facts and render findings of fact and conclusions of law on all applicable environmental, economic and other "broad interests of the public," including those matters raised by all participating governmental agencies pursuant to specific authority in the Florida Power Plant Siting Act, so that the hearing officer can properly effect a reasonable balance between need for this facility and the environmental impact resulting from its construction and operation. Treated as "given" or already established as a matter of law is the consistency and compliance order of the Governor and Cabinet.
No Florida court has interpreted section 403.519, but the language therein, as well as the language from section 403.508(3), compels the finding that the PSC is the sole judge as to the need for the power plant, with the hearing officer and, indeed, the Siting Board, bound by that determination.
Sierra contends that the certification is incorrect, even assuming that the PSC is the proper forum for determining need, in that the need assessment radically changed following the issuance of the PSC's report due to a decline in oil prices.
The Sierra Club initially moved to reopen the hearing on September 27, 1982, stating that, based on information it had from an article in the Orlando Sentinel, the PSC was reopening the need evaluation based on a revised economic forecast predicting lower *388 oil prices. The Sierra Club stated that the impact of the plant was proportional to any need; thus, if need went down, so would the level of impact allowable. The OUC and PSC responded to this motion, with the PSC stating that it was the exclusive forum for determining need, and that in any event, the PSC had not reopened the process of need evaluation, but that only some staff members had reevaluated the recommendation, still finding the plant cost effective. The hearing officer denied the motion to reopen on November 12, 1982, stating that the PSC has not receded from its earlier order finding need, and that the order was therefore binding. This order was subsequently adopted by the Board in its December 14, 1982 order.
It appears from the record that the PSC never reopened the "need" evaluation process, and that its initial determination that need was present remained unchanged. This is evidenced in a letter from the PSC chairman to the Florida Cabinet, sent on November 29, 1982, in which the chairman reiterates the findings of the PSC that the early construction of the unit is desirable from the standpoint of economic displacement of oil-fired generators. The letter continues that even with the oil price decline, oil displacement benefits could accrue in the first full year of operation, and that the determination of need continues to be well-founded.
The Sierra Club's final contention concerning the proper role of the PSC and the hearing officer concerns the issue of conservation measures. The Sierra Club had made a proffer of evidence from Dr. Barney Capehart, the gist of which was his contention that if OUC adopted a conservation program, it would not have to participate in building the proposed power plant. The OUC objected to this testimony under section 403.519, citing it as evidence of need, a matter proper only for the PSC to consider. The hearing officer disallowed the proffered testimony, stating that it dealt with matters properly before the PSC and thus was not proper for consideration in the certification hearing.
Section 403.519 specifically provides for the PSC to "expressly consider the conservation measures taken" as part of the need determination. This is in line with section 366.81, Florida Statutes (1981), which was adopted along with section 403.519, providing for the PSC to be the appropriate agency in adopting plans related to the conservation of electrical energy and natural gas usage.
Issues of conservation were considered by the PSC in the need hearing and were specifically addressed in the order determining need, thus meeting the statutory requirements. Since conservation issues are part of the need determination, and that determination is solely for the PSC, the exclusion of the evidence here was correct, as a reevaluation of need cannot occur. The proper forum for the introduction of this evidence would have been the PSC hearing on need. The Sierra Club did not participate in this hearing, nor did it present any testimony, and it should not be allowed to raise points in an improper forum simply because it failed to present the testimony in the appropriate one.
The determination of need is solely within the jurisdiction of the PSC, and any reevaluation of need at the certification hearing would be wasteful and improper. The purpose of that hearing is to judge the impact of the plant, after a need for the plant has been determined, on the surrounding environment. This determination does not require a weighing of the need beyond that done by the PSC, and the hearing officer and Board in this case were correct in so holding.
The Sierra Club also contends that the findings of fact by the hearing officer and Board were not based on substantial, competent evidence. Specifically, the Sierra Club claims that some evidence was not considered and that the hearing officer failed to make an explicit ruling as to other testimony.
Simply because some evidence is disregarded, that does not mean that the findings themselves are not based on other substantial, *389 competent evidence, which the finder in his judgment relied upon. Additionally, any claim that the hearing officer failed to make an explicit ruling on the facts is without merit, since the hearing officer specifically stated in his findings of fact:
To the extent that the proposed findings of fact and conclusions of law of any party in this proceeding have not been incorporated in this recommended order, those proposed findings of fact and conclusions of law are deemed irrelevant, immaterial, unsupported by competent, substantial evidence or otherwise unnecessary to the determination of this cause.
This is sufficient to show a ruling on the facts by the hearing officer. See Forrester v. Career Service Commission, 361 So.2d 220 (Fla. 1st DCA 1978), cert. denied, 368 So.2d 1366 (Fla. 1979). The decision to believe one expert over another is left to the hearing officer and the Board, and cannot be substituted by this court absent a finding of lack of competent, substantial evidence. See § 120.68(10), Fla. Stat. (1981).
There was substantial, competent evidence produced below on the issues discussed by the hearing officer in his findings of fact. Therefore, these findings, which were adopted by the Board, should not be upset by this court.
The final argument presented by the Sierra Club is that the hearing process was fundamentally unfair, denying the Sierra Club, as the only public interest representative, due process. In their argument on this point, the Sierra Club claims that the only true adversarial process was between the OUC and the Sierra Club, since the other state agencies and political organizations "had made their deals and did not critically question OUC's experts." The Sierra Club also claims equal opportunity was not given here, due to the unlimited funds OUC made available to itself to promote its position, which the Sierra Club could not match.
The arguments raised by Sierra in its final point are without merit. A remand of agency action is permitted if either the fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure. § 120.68(8), Fla. Stat. (1981). There has been no showing of that in the instant case.
The Sierra Club participated in the public hearing on land use, the certification hearing, and in the hearing before the Governor and Cabinet. At the latter two hearings, Sierra was represented by counsel and presented witnesses and testimony in its behalf. Furthermore, it was entitled to participate before the PSC, but specifically refused to do so. Thus, Sierra was given full opportunity to participate and to raise arguments as it desired. No showing is made of any violation of due process in the conduct of the hearings below, with the OUC lobbying effort not rising to the level of a constitutional deprivation requiring reversal of the Board's order.
The certification order issued by the siting board was proper, and is accordingly,
AFFIRMED.
ORFINGER, C.J., concurs.
SHARP, J., dissents with opinion.
SHARP, Judge, dissenting.
Judge Cobb's opinion in this case is forceful, logical, and persuasive. Although I would like to agree with him, I think there is a contrary, equally logical interpretation of section 403.519, Florida Statutes (1981), which involves procedural due process[1] as advocated by the Sierra Club. This question of interpretation of the Florida Electrical Power Plant Siting Act[2] (FEPPSA) is a matter of great public importance and interest. I would certify the issue of interpretation as one which should be resolved by our state supreme court.[3]
*390 The FEPPSA is one of three recently enacted statutes which consolidate, coordinate, simplify and streamline the permit and licensing requirements for the construction of facilities which have regional impact and which involve numerous state and local government agencies.[4] The question involved in this case is whether or not the procedure has been too simplified.
The FEPPSA, like the Transmission Line Siting Act[5] (TLSA), requires an applicant to obtain various approvals and reports from specified agencies, including the Public Service Commission (PSC), as a part of its application process. Under both acts, the statutes provide that the PSC's determination of need is a "condition precedent" to the conduct of the certification hearing.[6] But thereafter, the two statutes differ materially concerning the effect of the PSC's need determination.
The TLSA clearly provides that the commission's determination of need "shall be binding on all parties to any certification proceeding"[7], but section 403.519 of the FEPPSA provides only that the PSC's need determination "shall create a presumption of public need and necessity and shall serve as the commission's report required by s. 403.507(1)(b)." Section 403.519 was an amendment to the FEPPSA which was passed at the same time as the TLSA. This makes the difference in language and treatment even more significant. The legislature knows how to make a presumption "conclusive" when it means a finding cannot be challenged. It did so under the TLSA and has done so in other statutes.[8] But it did not so provide in section 403.519 of the FEPPSA. A presumption is generally rebuttable,[9] and I think the need determination here should be subject to challenge at the certification hearing level.
Under the TLSA, section 403.537 clearly requires the PSC to give notice to the public and interested persons of its hearing on need. It stresses that the PSC's determination constitutes "final agency action." Upon reading this statute, the conclusion is inescapable that a party seeking to challenge need must appear solely before the PSC. But there are no such provisions in the FEPPSA.
At the certification hearing under the TLSA, the issues for the hearing officer's consideration and findings are much more circumscribed than under the FEPPSA. The hearing officer's duties under the TLSA are basically: (1) to determine the completeness of the application; (2) receive DER's written reports and analysis; (3) conduct the certification hearing; (4) submit to the siting board a recommended order; (5) rule on motions to intervene and (6) alter time limits under the Act.[10] The officer's primary function appears to be the determination of disputes over the completeness or sufficiency of an application for certification.[11]
In contrast, under the FEPPSA, the purpose of the certification hearing, according to the stipulation set out in the majority opinion, is to
hear testimony and produce facts and render findings of fact and conclusions of law on all applicable environmental, economic and other "broad interests of the public," including those matters raised by all participating governmental agencies pursuant to specific authority in the Florida Power Plant Siting Act, so that the hearing officer can properly effect a reasonable balance between need for this facility and the environmental impact resulting from its construction and operation.
*391 It is difficult for me to conceive of how a hearing officer can weigh or balance the need for a plant against its adverse environmental impact if all evidence regarding the quality of the need is excluded. It is like putting a known quantity on one side of a scale, and then weighing it against an unknown on the other side. No realistic weighing can be done unless both components are examined and known.
NOTES
[1] The action is properly in this court pursuant to section 403.513, Florida Statutes (1981), which allows review pursuant to Chapter 120, and section 120.68(2), Florida Statutes (1981), which provides that review shall be held in the district court of appeal in the appellate district where the agency maintains its headquarters or where a party resides.
[1] Balino v. Department of Health and Rehabilitative Services, 362 So.2d 21 (Fla. 1st DCA 1978); § 120.54(3), Fla. Stat. (1981).
[2] §§ 403.501-403.517, Fla. Stat. (1981).
[3] Art. V, § 3(b)(4), Fla. Const.
[4] Hopping & Raepple, A Solution to the Regulatory Maze: The Transmission Line Siting Act, 8 Fla.St.U.L.Rev. 441 (1980).
[5] §§ 403.52-403.536, Fla. Stat. (1981).
[6] §§ 403.508(3), 403.537(1), Fla. Stat. (1981).
[7] § 403.537(1), Fla. Stat. (1981).
[8] Cf. § 742.11, Fla. Stat. (1981).
[9] § 90.301(2), Fla. Stat. (1981).
[10] §§ 403.525, 403.527, Fla. Stat. (1981); Hopping, supra note 4, at 448.
[11] § 403.527(5), Fla. Stat. (1981).