# BEAN v CNA INSURANCE COMPANIES

## Case No. 84-0046

State of Florida, Division of Administrative Hearings

January 26, 1985

## APPEARANCES OF COUNSEL

**Harry L. Lamb** for petitioner.
**Ann G. Lutterbeck** for respondent.

## OPINION

P. MICHAEL RUFF, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice this cause came on for formal hearing before P. Michael Ruff, duly designated Hearing Officer on April 23, 1984 in Orlando, Florida.

This matter arose originally on October 5, 1982 when Petitioner filed a charge of discrimination with the Florida Commission on Human Relations alleging that he had been terminated from his employment as a unit supervisor at CNA Insurance Companies in a discriminatory fashion based on his race and that further, the Respondent had failed

to provide him with the same equivalent training opportunities as were provided to non-black supervisors. After investigation, the Commission determined that no probable cause existed to believe an unlawful employment practice had occurred. A petition for redetermination was filed after Petitioner was granted an extension of time to file such a petition and Respondent's motion in opposition to the petition for redetermination was filed September 12, 1983. The Florida Commission on Human Relations reaffirmed the no probable cause finding on November 22, 1983.

On December 27, 1983, the Petitioner filed a verified complaint alleging the same discriminatory acts previously alleged in his charge of discrimination and adding a new allegation that he had further been discriminated against on the basis of race, by being assigned menial, physical labor tasks that were not assigned to his white counterparts. The Petitioner requested a formal hearing pursuant to Subsection 120.57(1), Florida Statutes, and the matter was forwarded by the Commission to the Division of Administrative Hearings, and the undersigned Hearing Officer assigned. A public hearing was held on April 23, 1984 at which the Petitioner presented six witnesses. The Respondent presented five witnesses and had Respondent's A, B & C admitted into evidence.

At the conclusion of the proceedings the parties elected to have the proceedings transcribed and to avail themselves of the right to file proposed findings of fact and conclusions of law. After an extended briefing schedule was requested and granted and a motion for extension of time to file briefs and proposed findings of fact and conclusions of law were granted, the subject pleadings were timely filed. The parties waived the requirements of Rule 28-5.402, Florida Administrative Code. All proposed findings of fact, conclusions of law, and supporting arguments have been considered. To the extent that they are in accordance with the findings, conclusions and view stated herein, they are accepted. To the extent that the proposed findings, conclusions and arguments asserted are inconsistent herewith, they are rejected. Certain proposed findings and conclusions are omitted as not relevant nor as necessary to a proper determination of the material issues presented. To the extent that the testimony of various witnesses is not in accord with the findings herein, it is not credited. See, *Sonny's Italian Restaurant v. Department of Business Regulation*, 414 So.2d 1156, 1157 (Fla. 3d DCA 1982); *Sierra Club v. Orlando Utilities Commission*, 436 So.2d 383 (Fla. 5th DCA 1983).

The issue to be resolved in this proceeding concerns whether the Petitioner was the victim of unlawful employment practices and an

unlawful employment termination imposed by the Respondent by virtue of his race.

## FINDINGS OF FACT

Glenn Bean was hired at CNA Insurance Companies on May 26, 1980 in the Orlando Branch Office as a unit supervisor of office services in the services department. The final decision to hire Mr. Bean was made by James Tyree, the Services Manager. Mr. Bean was chosen from among four candidates for the position. All the other candidates were caucasian. Mr. Bean's responsibilities were for the areas of customer service, accounting, supplies, photocopying, mail and the receptionist. Mr. Bean did not immediately assume responsibility for the accounting area, however, because training for that duty was required.

Mr. Bean began employment by reporting to the division supervisor, Ed Stapp, who set up an on-the-job training program for Mr. Bean and supervised its administration. Employees Jim Tyree, Ed Stapp and Sam Ingram were designated to provide Bean with training. They were all supervisory or management employees. Bean's training was more comprehensive than that of other unit supervisors because Mr. Bean was new to the CNA organization as well as to the insurance industry in general. The training lasted for about two months. Additional training focused on administrative skills was also provided the Petitioner by his immediate supervisor, Mr. Stapp. Bean's peer supervisors, Lorraine Crenco, Judy Mathias and William Christ received on-the-job training similar to that received by the Petitioner. Mr. Bean also received training in CNA's Corporate Management Development Programs II and III. Management Development Training Program II provided him with training in the timely administration of performance reviews over employees he supervised. Bean had a 90-day performance evaluation which rated him acceptable 90 days after his employment. Out of the five possible categories he was rated as acceptable in four: in one category he was rated as unacceptable. This unacceptable category was discussed with the Petitioner and he was put on notice that that was an area where he needed improvement. His 6-month performance evaluation rated his performance as "needs improvement." An action plan designed to alleviate his deficiencies was developed for him to permit him to improve and he subsequently satisfied that action plan and was removed from employment probation. He continued to work under Mr. Stapp's supervision until about February, 1981.

At the time he was rated "needs improvement" Mr. Bean complained that he needed more time for training. After being removed

144

from the action plan and from probationary status, he no longer continued to request additional training however. The additional training that he received was focused on administrative skills and organization. During the time he was on the "action plan" Mr. Stapp worked with him on a day-to-day basis trying to help him organize his work so that he could better handle the flow of work coming into his unit.

In approximately March, 1981, Mr. Bean began reporting to Bonnie Brennan, who became the supervisor in his division. He was actively supervising the accounting function by this time. Mr. Bean's unit was divided and the responsibilities were assigned to two other unit supervisors to free him for additional training in the accounting area. This was designed to enable Bean to gain competence in adequately supervising the accounting area of his unit. When he returned from his accounting training, his responsibilities included accounting as well as customer service and the switchboard. In March or April of 1981, he was meeting performance standards for all three units. His other former responsibilities were gradually added back to his job duties and area of supervision. When he resumed responsibility for his former functions, the functions were meeting corporate standards.

In addition to supervising the above functions, Bean had the responsibility for providing training and cross-training of personnel in his units, writing their performance reviews and other administrative responsibilities.

Bonnie Brennan made her first performance evaluation of Mr. Bean in February, 1982 for the period beginning January, 1981 to January, 1982. The overall rating was competent, however there were two specific areas where Bean's performance was unsatisfactory. Those were: timely completion of all personnel reviews and late response to management requests. These areas were ranked "needs improvement." All the performance evaluations Bean did on his own employees were done and submitted late. Bean was consistently late in reports he had to produce and when submitted they were frequently incomplete or incorrect and had to be returned for revision or editing. The Petitioner was late in doing his performance evaluations even though he received computerized warning notices in addition to reminders from his supervisor, Ms. Brennan. At and after his performance evaluation in February, 1982 there were morale problems among members of Mr. Bean's staff. For instance, he failed to provide a relief operator for the switchboard when the regular operator took a previously scheduled day off. At times he left the employment premises without telling his staff where he was going or when he would be back. He was also late in developing training plans for his employees.

Because of poor performance, Mr. Bean was placed on probation in May, 1982 for overall poor supervision of his departments, with the admonition that he was subject to termination. The corporate procedure at CNA dictates putting an employee on an "action plan" as an immediate step to improving performance, followed by probation if the action plan does not result in sufficiently improved performance. In this case, Ms. Brennan exercised an exception to that policy which was to go straight to a probationary status without the intervening action plan procedure. To utilize this exception, it was necessary to get the approval of the regional personnel manager. The exception was granted on the basis that Mr. Bean had previously been on an "action plan" for improving performance. Mr. Bean appealed the probation status in view of the CNA's "Corporate Step II policy." As part of his probation, Ms. Brennan met with Mr. Bean on a weekly basis. Some progress toward improvement was made. At the end of 60 days, the probation was extended for another 90 days. It was necessary to go through an approval process of the department manager, branch manager, branch personnel manager, and regional personnel manager in order to extend the probationary period. During the time of Mr. Bean's probation, a self-review program was introduced into the services department where Bean worked to replace the former external audit program. This self-review program required that unit supervisors review the status of their units relative to the quality of work and the unit's accomplishment of corporate goals. The new program was being initiated as a pilot project in the Orlando office. Mr. Bean also did a poor job of implementing his self-review procedure under the new program. His work was performed poorly and was incomplete when submitted. It could not be incorporated into the total department review project, thus, Ms. Brennan was unable to turn in completed work for her division on time and consequently had a "late submission" and was reprimanded herself for her late report, caused by the Respondent's dilatoriness and incompleteness. Mr. Bean failed to acknowledge that he had performance problems and in sessions with his supervisor designed to foster discussion of his work problems he tended to argue with his supervisor regarding their existence rather than constructively discuss improvement. Ultimately, when the Petitioner failed to improve, Ms. Brennan recommended his termination, which process once again took five levels of approval before the termination took place.

In addition to this complaint regarding discriminatory employment practice and termination, the Respondent was charged that he was assigned menial, physical labor tasks which were outside the scope of

146

his job responsibility and were tasks that were not required of other supervisors at his managerial level and that this was because of his race. The Petitioner complained that this work was so menial that he was required to wear old clothes to work and that he was the only employee or supervisor required to do this. His actual responsibility in connection with these "menial tasks" was to see that certain office files were relocated to an off-site storage site and to supervise the relocation of those files. Outside vendors were hired to actually do the physical transportation of the files. The relocation of the files was in conjunction with a move of the Petitioner's supply function from its old location to the seventh floor of his building. He was required to help put up shelving and to move boxes of paper and forms and the like. All this physical labor was performed in conjunction with the move of his department or unit to a different location and was not part of his regular duties. This was the only occasion in which he was required to wear old clothes to work and to perform physical tasks. He claimed he was the only employee or supervisor required to perform such menial work, however others did so, including his own division supervisor, Ms. Brennan, who on occasion wore bluejeans to the office when she performed certain physical chores. Mr. Bean's complaint regarding his alleged discriminatory termination was investigated by Mr. Russell Linton, the regional personnel manager of the Respondent. Bean's complaint indicated that he believed that he was a victim of discrimination, that management had a negative attitude toward him and that there had previously been a note in his personnel file recommending his termination. Mr. Linton interviewed persons who worked in daily contact with Bean, including employees Brennan, Tyree, personnel manager Patsy Powell and branch manager Ron Ventrella. His investigation did not reveal any difference in the treatment accorded Bean with that of his peers. The memo concerning his recommended termination had been placed in his personnel file during the time when his performance was deteriorating and it was anticipated by his supervisor that he would have to be terminated. His performance improved thereafter for a time and the note had been discarded or deemed void. Mr. Linton reviewed Bean's hiring process with Mr. Tyree and ascertained that Bean had been hired in preference to three white males because Tyree thought he could do the job well and was the best of the four candidates. Mr. Linton established through his testimony that the attitudes of Bean's peers in his office were that he was a fine young man and should be a success, and that they were disappointed when he seemed to be failing. The management's attitude toward Bean had changed from a positive one to a negative one because he did not appear to follow through on assurances concerning things he said he

147

would perform. Mr. Linton spent approximately one month in his investigation and approximately one and a half hours discussing his ultimate findings with Mr. Bean, who refused to accept his conclusions and prosecuted his complaint.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the subject matter of and the parties to this proceeding pursuant to Section 120.57(1), Florida Statutes.

Subsection 760.10(1)(a), Florida Statutes provides that it is an unlawful employment practice for an employer:

(a) To discharge or fail to refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, natural origin, age, handicap or marital status.

The Petitioner, in a case such as this, of course, carries the burden of establishing that an unlawful employment practice, including termination, has occurred. *Florida Department of Transportation v. J.W.C. Company, Inc.*, 396 So.2d 778 (Fla. 1st DCA 1981). In this regard, an opinion of the United States Supreme Court concerning the basic allocation of burdens and order of presentation of proof in an employment discrimination case is instructive. *Texas Department of Community Affairs v. Burdine*, 450 US 248, 101 S.Ct. 1089 (1981). In the *Burdine* case, the court held that the burden rests with the employee to prove by a preponderance of evidence a prima facie case of discrimination. If he succeeds, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the employee's discharge. Should the employer carry this burden, the employee must then prove by a preponderance of evidence that the legitimate reasons offered by the employer were not the true reasons but were rather a pretext for employment discrimination.

The Petitioner did not present a prima facie case of discrimination. He did not establish that he received less training than his non-black peer supervisors, that he was treated differently from them, that he was obliged to perform menial tasks when they were not, nor that he was discharged as a result of racial discrimination. The Petitioner did not demonstrate satisfactory performance of his job and that despite good performance he was discriminatorily discharged from his employment on the basis of his race.

Indeed, Mr. Bean had more extensive training than did his white

148

counterparts. His division supervisor prepared a training schedule for him designating various supervisors to provide specific training in each field. He was provided with manuals to review which gave him a specific background for his functions and was provided with job training on a day-to-day basis. This is the same training that his non-minority counterparts received. His training went beyond this however, and Mr. Stapp helped him on a daily basis to organize his work so he could become an effective supervisor. Despite these efforts he was unable to perform satisfactorily. Lorraine Crenco, Judy Mathias and Bill Christ received similar basic training to that Bean received and there is no evidence or testimony adduced at all to suggest that these non-minority peer supervisors received additional training that Bean did not get.

When Mr. Bean first understood his responsibilities he was not given the accounting function responsibility in order to allow him time to adapt to his new responsibilities gradually. When he finally assumed control of the accounting unit he was not able to keep the unit functioning at an acceptable level, so he was relieved of that responsibility in order to get special training to equip him to manage accounting. This was above and beyond the type and amount of training that his non-minority counterparts received. Additionally, after being apprised of performance problems during his period of employment and being placed on an action plan and on probation, he received one-on-one daily counseling and training from his supervisor. Bean acknowledged in his testimony that he received special training in management development II and III as did his non-minority counterparts. This is corporate training afforded to all supervisors to assist them in improving in managerial skills. In short, Mr. Bean demonstrated no instance of his receiving less training than did his non-minority counterparts. Indeed, the evidence shows that not only did Mr. Bean receive more training than his non-minority counterparts, but that the supervisory staff made special efforts to help him succeed in his position.

The record does not reflect any evidence that Petitioner was treated differently than any other employees who were his peers in the assignment of menial tasks. Mr. Bean testified that in the course of moving the office, he and some of his staff were engaged in physically rearranging shelves in the storeroom. At no time in his testimony did he show that other non-minority supervisors did not engage in the same type of physical, menial chores on occasion. Indeed, his own supervisor, Ms. Brennan, testified that she wore bluejeans to the office and engaged in menial chores at this time and on other occasions when it was warranted. Thus, Mr. Bean has failed to demonstrate that he

was treated in a discriminatory manner regarding the assignment of physical, menial chores.

In summary, it is apparent from the evidence adduced in this proceeding and the above Findings of Fact that the Petitioner was terminated solely on the basis of his poor work performance. As early as 90 days after his hiring he was advised that in some areas of performance he was unacceptable, even though his overall rating was acceptable. At the end of the first six months of employment, he was advised that he was not meeting expectations fully and needed improvement. He was placed on an action plan so that he knew exactly where his deficiencies lay and what he had to do to meet the standards of his position. He remonstrated repeatedly that he "needed training," but he had received the usual training necessary to do the job already, and then received special assistance on a one-on-one daily basis from his supervisor.

He ultimately improved enough to be removed from the action plan but began to have additional problems with his administrative skills, organization and timeliness when he assumed responsibility for the accounting function of his job. This time he was removed from his job altogether to give him special, concentrated training in the area of accounting. When he returned from that training he resumed his job responsibilities one by one. As soon as he had full responsibilities for his job however, he began to fail again. For the reasons asserted in the above Findings of Fact it was necessary once again to address his performance problems and so he was placed on probation after his supervisor engaged in a lengthy approval process. He received daily counseling from his supervisor. His probation was extended, giving him additional time to improve his performance to a satisfactory level.

Bean, like all CNA employees is protected from the whim or judgment of a single superior by an approval process, without which no personnel action can be taken. This involves approval of the personnel manager at the branch office, the regional personnel manager, the services manager and the branch manager, before probation can be administered. All of them concurred in this step. When Bean failed to improve, it was necesary to again get all their concurrences before he could be terminated. Again, they unanimously agreed that his failure to improve was such that termination was the only recourse. This however, was not the only recourse for Bean. He had, and used, an internal appeal process, "Step II," with the regional personnel manager when he was put on probation. Thus, the regional personnel manager under this procedure, investigated the circumstances and found that Bean was

**150**

well-liked, that he had been chosen over three white candidates at the time of his hiring, and that others wished him to succeed and were disappointed when he failed to do so. His overall performance was unsatisfactory, which was amply documented. Once the five-step approval process was taken for his termination, he was terminated for poor performance. He then appealed to the chairman of the board of CNA, who ordered an independent review of the circumstances surrounding his termination. That review also confirmed all prior actions. In short, there has simply not been established any prima facie case of discriminatory or disparate treatment of Mr. Bean during the course of his employment, nor in the circumstances surrounding his termination. There was simply no evidence probative of his assertion that his treatment, while employed, and his discharge, was based upon his race. It is thus concluded that no unlawful employment practice has occurred and that the petition for relief should be denied.

## RECOMMENDATION

Having considered the foregoing Findings of Fact, Conclusions of Law, the evidence of record, the candor and demeanor of the witnesses and the pleadings and arguments of the parties, it is, therefore

RECOMMENDED:

That the petition for relief filed by Glenn Bean be dismissed, with prejudice.