WENTWORTH, Senior Judge.
Florida Sugar Cane League and its component members (Sugar) appeal an April 17, 1990 final order of the Governor and Cabinet, acting as a Siting Board and adopting a hearing officer’s recommended order to grant Florida Power & Light Company’s (FP & L) application for certification of an electrical transmission line corridor under the Transmission Line Siting Act (the act).[1] We affirm based on our review of the extensive findings and conclusions of the Siting Board and the hearing officer.
FP & L initiated the process by requesting the Florida Public Service Commission (PSC) to determine the need[2] for a proposed electrical transmission line corridor extending about 150 miles from Midway substation in St. Lucie County to Levee substation in Dade County, and for the construction and maintenance of a 500 kilo-volt transmission line therein. The transmission line is intended to connect two intermediate substations — the Corbett substation in Palm Beach County and the proposed Conservation substation in Broward County. The PSC issued its order on May 25, 1988, determining in part that the line was needed to prevent a blackout in southeast Florida due to a single catastrophic event, to eliminate the need for future transmission system improvements, and to reduce transmission system energy losses.
FP & L then filed its application for certification of the transmission line corridor with the Florida Department of Environmental Regulation (DER) on January 9, 1989. A hearing officer scheduled the certification hearing for August 28, 1989, and set August 11 as the deadline for filing proposed alternate corridors. The South Florida Water Management District (SFWMD) proposed an alternate corridor between the Corbett and Levee substations that traversed portions of the Everglades Agricultural Area, which is devoted to sugar cane cultivation, and includes lands owned and controlled by Sugar. Sugar submitted an alternate corridor that would narrow the corridor described in SFWMD’s proposal. The hearing officer denied all motions for extensions to file additional proposals after the deadline and rescheduled the certification hearing for November 13, 1989.
FP & L accepted the SFWMD proposal and rejected Sugar’s proposal on September 28. DER filed its final report on October 27,1989. The formal certification hearing was held in various locations between November 13 and December 1, 1989. The hearing officer rendered her recommended order on March 2,1990, recommending that the Siting Board grant certification for the location of a transmission line within the alternate corridors proposed by the SFWMD and Treasure Coast Regional Planning Council (TCRPC), in accordance with stated conditions of certification. The Siting Board approved the recommended order by its final order of April 17, 1990.
Sugar first contends that FP & L failed its burden under the act, and therefore the Siting Board’s action cannot be sustained. The act imposes several standards on the Siting Board in reviewing an application for final disposition, two of which are at issue here:
(3) In determining whether an application should be approved ... or denied, *849 the board shall consider whether, and the extent to which, the location of the transmission line corridor and the construction and maintenance of the transmission line will:
[[Image here]]
(c) Comply with nonprocedural requirements of agencies;
[[Image here]]
(e) Effect a reasonable balance between the need for the transmission line as a means of providing abundant low-cost electrical energy and the impact upon the public and the environment resulting from the location of the transmission line corridor and maintenance of the transmission lines.
§ 403.529(3), Fla.Stat. (1987). The two primary agencies imposing relevant substantive nonprocedural requirements on an applicant are DER, which focuses on water quality and dredge and fill activities in wetlands, and SFWMD, which regulates water flow, wetlands impacts, and the use of district works. See, e.g., Fla.Admin. Code r. 17-312 (dredge and fill activities in DER jurisdictional wetlands); Fla.Admin. Code r. 40E-4 (surface water management regulations within SFWMD). See also § 403.918(1), Fla.Stat. (1987) (requiring applicant to provide reasonable assurance to DER that water quality standards will not be violated); § 403.918(2), Fla.Stat. (1987) (requiring applicant to provide reasonable assurance to DER that a project is not contrary to public interest). Sugar contends that FP & L has not shown that it will comply with the nonprocedural requirements of those agencies. Sugar adds that the Siting Board, without adequate information before it, cannot balance the need for the transmission line with the impact on the public and environment as required by section 403.529(3)(e).
The Siting Board candidly admits that it is impossible for FP & L to quantify the impacts that construction of the line will have on wetlands until the location of the right-of-way is determined. Indeed, the recommended order adopted by the Siting Board included the following finding relative to wetlands impacts:
It is expected that the construction of the transmission line will result in a variety of impacts to the wetlands within all the proposed corridors.... The regulatory agencies have been unable to specifically detail the impacts to each wetland area that will be affected because they do not know where the right-of-way will be located within the corridor. Until the right-of-way is selected, it is not possible to quantify these impacts.[3]
Sugar maintains that certification under the statutory scheme imposes statutory finality — once certification is granted, the project is authorized and no further approvals are ■ contemplated. Thus pre-certification approval of conditions assertedly violates the act, see section 403.531(1), Florida Statutes (1987) (“certification shall constitute the sole license of the state and any agency as to the approval of the location of transmission line corridors and the construction and maintenance of transmission lines”).
We do not find that this alleged internal inconsistency is fatal to the statutory scheme, for the legislature specifically allows an applicant to identify the location of the transmission line right-of-way after certification,[4] and allows the Siting Board to *850 impose conditions of certification to accomplish the aims of the act.[5] The hearing officer found that the proposed corridors will comply with the nonprocedural requirements of state, regional, and local agencies if FP & L complies with the conditions of certification imposed in her recommended order, and that the location of the transmission line accomplishes a reasonable balance between the need for the line and its impact. The Siting Board adopted the proposed order on these points. We find no reason to disturb the agency findings. Baptist Hosp., Inc. v. State, Dep’t Health & Rehabilitative Servs., 500 So.2d 620, 624 (Fla. 1st DCA 1986).
Sugar notes that FP & L requires a one mile separation between the proposed transmission line and any existing transmission line, and that an existing line parallels the eastern edge of the one-mile-wide corridor proposed by SFWMD. For that reason, Sugar asserts, FP & L must locate the transmission line right-of-way at the western-most boundary of the corridor. The argument is that FP & L is thus capable of quantifying the wetlands’ impact, and FP & L’s failure to do so in advance of certification should be fatal to its cause.
We conclude that the legislature need not require an applicant who opts for the post-certification compliance procedures to comply also with pre-certification requirements when circumstances exist that compel the applicant to locate a right-of-way in a particular segment of a proposed corridor. We note that Sugar does not demonstrate that the conditions imposed by the Siting Board are less likely to assure compliance with nonprocedural requirements in the SFWMD corridor than the requirements in other corridors where FP & L is unable to determine the location of the right-of-way in advance of certification.
Next, Sugar contends that the $28 million that FP & L agreed to pay to offset the impacts of transmission line construction and maintenance does not constitute mitigation under the act. “Mitigation” is defined by agency rule to mean:
(6) ... an action or series of actions that will offset the adverse impacts on the waters of the state that cause a proposed dredge and fill project to be not permitta-ble. “Mitigation” does not mean:
(a) avoidance of environmental impacts by restricting, modifying or eliminating the proposed dredging and filling.
(b) cash payments, unless payments are specified for use in a previously identified, Department endorsed, environmental or restoration project and the payments initiate a project or supplement an ongoing project. The project shall be sponsored or approved by a governmental agency and the adverse impacts of the dredge and fill project shall be offset by that previously identified project.
Fla.Admin.Code r. 17-312.310(6). The conditions expressly required FP & L to provide mitigation “for any wetland or open-water habitat degraded or destroyed as a result of the construction of any portion of the transmission line.” FP & L is required to submit mitigation plans to DER, SFWMD, and local governments, which shall include:
(i) Specific acreage figures and locations of all impacted portions of wetlands, both within the [right-of-way] as well as adjacent to it, which would be impacted by the construction activities, including an *851 explanation of why no feasible alternative exists;
(ii) A discussion of the proposed mitigation activities to be undertaken, including the location of all mitigation areas and a description of the manner in which these areas will be created, restored or otherwise enhanced;
(iii) A timetable for accomplishing the proposed mitigation activities ... concurrently with the construction of the transmission line ...; and
(iv) A monitoring and maintenance program, including success criteria, to ensure the survival and success of any created, restored, or enhanced wetlands.
The hearing officer found that the two-part mitigation program, which benefits the Surface Water Improvement Management Plan[6] and melaleuca research and eradication, satisfies all SFWMD and DER requirements. The Siting Board agreed. We are disinclined to disturb their conclusions based on the established principle that agency policy determinations should be accorded deference by a reviewing court. Baptist Hosp., 500 So.2d at 624.
Third, Sugar argues that the certification process violates the due process clause of article I, section 9 of the Florida Constitution. The Siting Board correctly notes that Sugar’s attack is not primarily against the actions of the Board, but against the statutory provisions that bifurcate “need” determination by the PSC on the one hand and the certification proceedings on the other. We find Sugar’s contentions on this point inadequate to state a meritorious broadside constitutional attack upon the statutory scheme. See Florida Chapter of Sierra Club v. Orlando Utils. Comm’n, 436 So.2d 383, 387 (Fla. 5th DCA 1983) (upholding statutory scheme that recognizes PSC as the sole determiner of need in the context of electrical power plant siting). Nor can we find as to post-certification remedies that the act implicates due process standards by shifting the burden of proof to Sugar to show noncompliance with applicable conditions in post-certification review, either direct or collateral. Florida law provides numerous opportunities for affected persons to obtain review of agency determinations. See, e.g., § 120.68, Fla. Stat. (1987) (judicial review); § 120.69, Fla. Stat. (1987) (enforcement of agency action); § 403.412(2), Fla.Stat. (1987) (injunction for violation of Environmental Protection Act of 1971); Fla.Admin.Code r. 17-17.600(5) (“[pjersons whose substantial interests may be affected by the submittal may have the right to petition for a declaratory statement ... or to file a verified complaint”).
Finally, Sugar contends that the Siting Board erred in failing to grant Sugar’s exceptions to the hearing officer’s recommended order, including several findings relating to transmission line spacing and environmental impact, to certain of the hearing officer’s conclusions of law, and to the criterion for statutory balancing. In each instance, the Siting Board rejected the exceptions as unsupported by the record, or lacking merit. All of Sugar’s exceptions to the recommended order were addressed by the Siting Board. Although the record may contain evidence contrary to the hearing officer’s findings, neither the agency head nor a reviewing court may overturn a finding of fact that is supported by competent substantial evidence. Heifetz v. Department of Business Regulation, Div. of Alcoholic Beverages & Tobacco, 475 So.2d 1277, 1283 (Fla. 1st DCA 1985). The final and recommended orders adequately state the basis for the agency’s disposition of the issues raised.
Affirmed.
SMITH and WIGGINTON, JJ., concur.

. Ch. 80-65, Laws of Fla. (codified as amended at §§ 403.52-.536, Fla.Stat. (1987)).

. § 403.537, Fla.Stat. (1987).

. See also Final Order at 10-11 ("At issue here is not a refusal by an applicant for certification to accept the need for wetland mitigation measures satisfactory to affected agencies. Rather, what is involved is the understandable inability of agencies such as DER to define precisely appropriate mitigative measures before the specific wetland impacts associated with transmission line construction are known. This is not to say that DER cannot now project where impacts requiring mitigation are likely to oc-cur_").

. The act draws an important distinction between a transmission line corridor and a transmission line right-of-way. A “corridor” is "the proposed area within which a transmission line right-of-way is to be located," section 403.522(9), Florida Statutes (1987), whereas the "transmission line right-of-way” refers to the particular “land necessary for construction and maintenance of a transmission line,” which:
shall be located within the certified corridor and shall be identified by the applicant subsequent to certification in documents filed with the department prior to construction.
*850 § 403.522(16), Fla.Stat. (1987) (emphasis added). See also Fla.Admin.Code r. 17-17.665(1) (providing that the applicant shall, at its option, show compliance with dredge and fill requirements in DER jurisdictional wetlands, or submit to post-certification procedures for monitoring compliance with those requirements).

. § 403.522(6), Fla.Stat. (1987) ("‘Certification’ means the approval by the board of a corridor proper for certification ... and the construction and maintenance of transmission lines within such corridor with such modifications or conditions as the board deems appropriate_”) (emphasis added); see also Fla.Admin.Code r. 17-17.590(3) (“The agency reports shall contain: -, (c) Proposed Conditions of Certification ... on matters within the agency’s jurisdic-tion_”); Fla.Admin.Code r. 17-17.665(1) (“The applicant shall show compliance with the department’s dredging and filling requirements ... and may, at its option, elect to do so: _ (b) As part of a postcertification monitoring review process pursuant to the conditions of certification and prior to the conduct of any construction activities_”).

. Ch. 87-97, Laws of Fla. (codified as amended at §§ 373.451-4595, Fla.Stat. (1989)).